IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID LOREN WALDECK,<br><br>Defendant. | CR 22–59–M–DWM<br><br><br>OPINION<br>and ORDER |

    Defendant David Loren Waldeck is charged with possession with intent to distribute methamphetamine, fentanyl, and cocaine in violation of 21 U.S.C. § 841(a)(1).  (Doc. 10.)  The charges arise out of a traffic stop that occurred on October 24, 2022, in Lake County, Montana.  (*See id.*)  Waldeck seeks to suppress the evidence seized from the search of his vehicle on the basis that law enforcement lacked reasonable suspicion to initiate the traffic stop.  (Doc. 51.)  A motion hearing was held on March 23, 2023, where the government called two witnesses, Tribal Investigators Christian Haynes and Vernon Fisher.  Having considered the parties' filings, the record evidence, and the arguments at the hearing, Waldeck's motion to suppress is denied.

## BACKGROUND

    The following factual background is taken from the in-court testimony of

1

Investigators Haynes and Fisher, the law enforcement incident reports by Haynes and Fisher, (Docs. 52-1, 52-2), Haynes' bodycam footage of Waldeck's traffic stop,[1] (*see* Doc. 53), and Haynes' and Fisher's bodycam footage of a prior traffic stop of an informant, (*see* Doc. 59). All the events in question occurred on October 24, 2022.

I.  **The Informant**

Lake County law enforcement had information that Kelsea Rodriguez, a known drug user and distributor, was traveling to the Flathead Indian Reservation to distribute illegal drugs. (Doc. 52-2 at 1.) On October 13, 2022, Lake County Detective Scott Sciaretta obtained a search warrant to track the GPS location of Rodriguez's cellphone. (*Id.* at 3.) The GPS information indicated that Rodriguez arrived on the Reservation on the morning of October 24, 2022 from Spokane, Washington. (*Id.* at 1.) Haynes and Fisher located Rodriguez at the Port Polson Inn and observed her interact with another known drug user and distributor before leaving in a vehicle traveling south on Highway 93. (*Id.* at 2, 3.) They stopped the vehicle because Rodriguez had active warrants and a suspended driver's license.

---

[1] The timestamp on Haynes' bodycam footage does not correspond with the actual time. When the footage begins, the timestamp reads: "2022-10-24 T23:58:36Z," which translates to 11:58 p.m. on October 24, 2022. However, the actual traffic stop occurred closer to 6:00 p.m. on that same day. This same date/time inconsistency is also present in Haynes' bodycam footage of the informant. Fisher's bodycam footage does not have a timestamp.

2

(*Id.*)  This stop occurred just before 5:00 p.m.  (Haynes & Fisher Test.)

After Rodriguez got out of the vehicle, she told Haynes that somebody named "David" was in town, drove a newer bright red Ford Mustang or Dodge Charger, and had a lot of "weight," which Haynes understood to mean a large quantity of drugs.  (Doc. 52-2 at 2.)  Rodriguez indicated that she did not know David's last name, but did know that he would be returning from Kalispell shortly, was an older man, was from Oregon, was a known drug dealer, and was supposed to have a lot of methamphetamine and "blues"—blue counterfeit oxycodone pills containing fentanyl.  (*Id.* at 2, 3.)  Rodriguez planned to meet with "David" to buy drugs off of him.  (Haynes Test.)  Rodriguez said that she had encouraged this individual to come to the Reservation to sell fentanyl due to the drug's high street price there.  (Haynes Test.)  Rodriguez also stated that if they ran the plates on the Mustang or Charger, they would come back registered to "David" and that if they looked him up, he would have a lengthy drug and criminal history.  (Fisher Test.)  Although Rodriguez specifically said that she told "David" not to stay at the Kwataqnuk Resort and Casino, Haynes recalled that he and Fisher had seen a red Dodge Charger with Washington plates at the Kwataqnuk when they were driving around Polson earlier and believed it could be this "David."  (Doc. 52-2 at 2; Haynes & Fisher Test.)

Fisher followed up with Rodriguez about her dealings with "David,"

3

reviewing text messages on Rodriguez's phone. "David" was saved in her phone as "Dave Big Dog," and their text messages indicated that Rodriguez was going to give "David" $400 for "clear" (methamphetamine). One of the messages stated that the "clear" had "salt" in it, which Rodriguez clarified she knew because he had previously given her an eight ball to smoke. (Fisher Test.) The officers did not ask Rodriguez, however, how she met "David" or how long the two had known each other. (Haynes & Fisher Test.)

Although both Haynes and Fisher had previously interacted with Rodriguez on more than one occasion in a law enforcement capacity, she had never acted as an informant and had not previously provided any information about drug activity on the Reservation. (Haynes & Fisher Test.) Rodriguez was ultimately released at the scene without being charged, for two apparent reasons: first, because there was no room for a female detainee at the Lake County Jail, and second, because the officers believed Rodriguez would provide them with further information when "David" returned to Polson, specifically whether he was still driving a red Charger.[2] (Doc. 52-2 at 4; Haynes & Fisher Test.)

## II. Waldeck's Traffic Stop

Around 5:30 p.m., following their interaction with Rodriguez, Haynes and

---

[2] While Rodriguez repeatedly referred to either a Mustang or a Charger throughout her interaction with the officers, she steadily became more sure that it was, in fact, a Charger.

Fisher observed a male exit a newer red, 2015 Dodge Charger with a Washington license plate parked in the upper-level parking lot of the Kwataqnuk. (Doc. 52-1 at 2, 4; Fisher Test.) While they were watching the vehicle, they received a text from Rodriguez stating that the "David" she had referred to earlier was not in Polson yet and would not be returning from Kalispell until the next day. (Haynes & Fisher Test.) She did clarify, however, that he was driving a red Charger with either Oregon or Washington plates. (Haynes Test.) The officers were understandably confused by her message, however, as they were in that moment observing a red Dodge Charge they believed belonged to "David." (Fisher Test.) Thus, Rodriguez lied to them. (Fisher Test.) The officers received no further communication from Rodriguez. (Haynes & Fisher Test.)

When Fisher checked the registration of the Charger through dispatch, he was advised that it was registered to a "David Waldeck." (Doc. 52-1 at 2, 4.) Haynes then googled Waldeck's name and located an online news article indicating that Waldeck has been involved in drug activity in 2016 and that he had "a criminal history of more than a dozen felony convictions for crimes including possession of controlled substances." (*Id.* at 2.) The officers identified Waldeck using a Facebook photo. (*Id.* at 4.) Haynes and Fisher subsequently observed Waldeck leave the Kwataqnuk and drive one block east on Highway 93 to the Port Polson Inn. (*Id.* at 2, 4.) There, they observed Waldeck park and speak to

5

Rodriguez from his vehicle. (*Id.*) The officers were not able to tell, however, if the two exchanged anything. (Haynes & Fisher Test.)

Waldeck left the Port Polson Inn without exiting his vehicle, driving south on Highway 93, which eventually becomes a four-lane highway. (*Id.* at 2–3, 4.) Haynes and Fisher followed in their unmarked patrol vehicle. (*Id.*) They observed him travelling in the left passing lane for several miles, not overtaking any other vehicles and travelling below the speed limit. (*Id.* at 3, 4.) Another vehicle even came up behind Waldeck's vehicle in the left lane in an attempt to pass, but was unable to do so because Waldeck remained in the passing lane. (*Id.*) At approximately 6:00 p.m., Haynes and Fisher initiated a traffic stop roughly five miles from the Port Polson Inn. (Haynes & Fisher Test.) Although Waldeck did not pull over immediately, he eventually made a left turn onto Minesinger Trail and stopped. (Doc. 52-1 at 3, 4.)

Haynes exited the patrol vehicle and approached the driver side of the Charger. (*Id.*) Fisher approached the passenger side of the vehicle. (*Id.* at 4.) Haynes introduced himself and Waldeck provided him with a Washington driver's license. (*Id.* at 3.) Haynes informed Waldeck why he was being pulled over and asked Waldeck if he knew that he could not travel in the passing lane. (*Id.*) Waldeck said that he did and then, at Haynes' request, provided his registration and began to look in his wallet for his insurance. (*Id.*) At this point, Haynes had

6

observed that Waldeck was sniffling and that he had a Suboxone Sublingual Film package in the middle cup holder. (*Id.*) Haynes knew that as a Schedule 3 controlled substance, it was illegal to possess Suboxone without a prescription. (*Id.*) Fisher also observed that there was pepper spray on the front passenger seat. (*Id.* at 4.)

Haynes asked Waldeck to exit the vehicle and if he had any weapons. (*Id.* at 3.) Waldeck said that he did not have any weapons. (*Id.*) As Waldeck opened the door and exited the vehicle, Haynes observed a glass pipe with a bulb at the end located inside the driver door panel compartment. (*Id.*) Haynes could see that the pipe had white residue in it, which he suspected to be methamphetamine. (*Id.*) Haynes moved the pipe to the roof of the vehicle and informed Waldeck that he was in possession of drug paraphernalia. (*Id.*) Fisher touched the glass pipe and believed it felt warm, indicating recent use. (*Id.* at 4.) Haynes asked Waldeck if there were any more drugs or drug paraphernalia in the car, which Waldeck denied. (*Id.* at 3.) He also asked Waldeck if he had anything in his pockets. Although Waldeck denied that he did, Haynes removed a knife and other personal property from his pockets. (*Id.*)

Haynes asked if he could search Waldeck's vehicle. (*Id.* at 3, 4.) Waldeck refused consent to search the vehicle. (*Id.*) Haynes informed Waldeck that they would seize the vehicle and apply for a warrant. (*Id.* at 3.) Fisher informed

Waldeck that he was under arrest and read him his *Miranda* rights. (*Id.* at 4.) When asked by officers, Waldeck stated that he had just gotten to the area that morning to visit friends and was planning to stay a few days. (*Id.* at 3.) Waldeck was cited for criminal possession of dangerous drugs, placed in a patrol vehicle, and taken to the Lake County Jail. (*Id.* at 4–5.) Waldeck was not cited, however, for a traffic violation. (Fisher Test.) The vehicle was towed to a secure lot and a search warrant was obtained. (Doc. 52-1 at 5.) Upon execution of the warrant, investigators located approximately 472.4 grams of fentanyl pills, approximately 863.9 grams of methamphetamine, and approximately 516.6 grams of cocaine, as well as cash and other items indicative of drug use and distribution. (*See* Doc. 1-1 at 3.)

## ANALYSIS

Waldeck insists that the officers lacked reasonable suspicion to instigate an investigatory stop, specifically highlighting the nuances in Montana's permissive use of the left-hand lane and the fact that Rodriguez provided unreliable information and did not have a proven track record as an informant. Both arguments lack merit.

### I. Traffic Violation

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons

8

or vehicles that fall short of traditional arrest." *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Nevertheless, police officers may conduct a traffic stop when they have reasonable suspicion to believe that a motorist has committed a traffic violation. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) ("[T]he Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (internal quotation marks omitted). "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and capable of rational explanation." *Id.* (internal quotation marks omitted). If "officers have probable cause to believe that a traffic violation has occurred, the officers may conduct a traffic stop even if the stop serves some other purpose." *Willis*, 431 F.3d at 715. As discussed at the March 23 hearing, this type of stop is also known as a "wall stop."

In this context, the government has the burden to produce "specific and articulable facts" to support a suspicion of illegal activity justifying an

9

investigatory stop.³ *Id.* at 715 n.5 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *see also id.* at 724 ("[T]he police officer has the initial burden of production." (Fletcher, J., dissenting)). Nevertheless, "[t]he defendant has the burden of proof on a motion to suppress evidence." *Id.* at 715 n.5 (citing *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005)). Accordingly, once the government has presented specific and articulable facts to justify a search or seizure, a defendant must refute any evidence or testimony presented by the government in order to "cast doubt" on the validity of that search or seizure. *Id.*

Here, Waldeck argues that although law enforcement suspected him of violating a traffic law, "their suspicion was not reasonable." (Doc. 52 at 9.) It is undisputed that Waldeck's purported traffic violation was travelling in the passing lane. Waldeck insists, however, that "it is not per se illegal to operate a vehicle in the left-hand lane of a roadway" and that because there was no traffic that day, he did not impede the flow of traffic. (*Id.*) While Waldeck is correct that there are conditions under which travel in the left-hand lane is allowed, none of those conditions permitted his continuous presence in that lane here.

Pursuant to Montana Code Annotated § 61–8–321, a vehicle must be

---

³ This is consistent with the requirement that the government bears the burden of proving by a preponderance of the evidence that one of the delineated exceptions to the Fourth Amendment's warrant requirement applies. *See United States v. Huguez-Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992).

operated in the right-hand lane of a roadway "having two or more lanes of traffic moving the same direction" unless:

> (i) overtaking and passing another vehicle proceeding in the same direction;
>
> (ii) traveling at a speed greater than the traffic flow;
>
> (iii) moving left to allow traffic to merge;
>
> (iv) traveling on a roadway within the official boundaries of a city or town . . . ;
>
> (v) preparing for a left turn at an intersection or into a private road or driveway when a left turn is legally permitted;
>
> (vi) exiting onto a left-hand exit from a controlled-access highway;
>
> (vii) an obstruction or hazardous conditions make it necessary to drive in a lane other than the right-hand lane;
>
> (viii) road or vehicle conditions make it safer to drive in a lane other than the right-hand lane; or
>
> (ix) authorized snow-removal equipment is operating on the roadway.

Mont. Code Ann. § 61–8–321(3)(a), (b).

Waldeck insists three of these exceptions apply here. First, Waldeck argues that when he headed south on Highway 93 out of Polson, he was within the official boundaries of a city—the city of Polson—as provided for in subsection (iv). Second, Waldeck argues that once he left city limits, he was permitted to remain in the left-hand lane because the patrol vehicle's presence in the right-hand lane made it necessary and/or safer to drive in the left-hand lane pursuant to subsection (viii).

11

Finally, Waldeck argues that his presence in the left-hand lane was justified because he ultimately made a left-hand turn onto Minesinger Trail, as provided for in subsection (v). While Waldeck's third argument has some merit in isolation, his continuous presence well before the turn off for Minesinger Lane gave the officers reasonable suspicion that the law had been violated.

As it relates to Waldeck's first argument, there is no dispute that he began his journey within Polson city limits. However, the officers' testimony established that this exception does not apply here because Highway 93 is only a two-lane highway within Polson city limits. As Fisher clarified, the four-lane portion of Highway 93 begins where Polson's city limits end. Thus, none of Waldeck's travel in the left-hand lane occurred within city limits.

Waldeck's second argument fares no better. Waldeck argues that the patrol vehicle's presence in the right-hand lane forced him to remain in the left-hand lane. That argument—which includes no further analysis—is belied by the body cam footage, which shows that the patrol vehicle was multiple car-lengths behind Waldeck for most of the journey. There was plenty of room, and many opportunities, for Waldeck to move into the right lane, especially when another vehicle attempted to overtake him in the left-hand lane.

Finally, Waldeck insists that his travel in the left-hand lane was warranted because he ultimately turned left onto Minesinger Trail. While this may justify

12

some travel in the left-hand lane, it does not provide a basis for Waldeck remaining in that lane for over three miles. And, as indicated by Fisher in his testimony, Waldeck remained in the left-hand lane through four or five intersections before ultimately turning on Minesinger Trail *after* the officers had activated their lights. Thus, none of the exceptions cited by Waldeck justify his continuous travel in the left-hand lane.

At the suppression hearing, Waldeck appeared to make an additional argument, insisting that because there were no other vehicles on the road, his presence in the left-hand lane and his reduced speed did not interfere with the flow of traffic, and was therefore permitted. This argument is problematic for two reasons. First, there was another vehicle on the highway and that vehicle unsuccessfully attempted to overtake Waldeck. Thus, the facts do not support this contention. Second, this purported "exception" does not appear in § 61–8–321(3)(b). To the contrary, § 61–8–321(3)(a) mandates travel in the right-hand lane unless an enumerated exception applies. Contrary to Waldeck's assertion, one cannot simply travel in the passing lane because the road is empty.

But even if Waldeck's driving conduct was found to be entirely legal after the fact, that does not preclude a determination that the stop was lawful for two additional reasons. First, an officer need not be completely sure that a traffic violation has indeed occurred; rather, "[i]f the facts are sufficient to lead an officer

13

to reasonably believe that there was a violation, that will suffice[.]" *United States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006) (internal quotation marks omitted). Second, "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground." *Id.* at 61. Here, Haynes informs Waldeck that he is being pulled over for traveling in the passing lane, which is permitted only to overtake other vehicles. (Body Cam, Doc. 53 at 00:01:26.) Based on the Montana statute outlined above, that understates the scope of authorized left-hand lane travel. However, that error of law was reasonable because the presumption under the statute is that vehicles must operate in the right-hand lane unless specific, independent circumstances exist. Generally, that means an individual will stay in the right-hand lane until triggered by one of the exigencies identified in the statute. Contrary to Waldeck's characterization, the statute does not permit someone to continuously travel in the left-hand lane under an evolving justification. Thus, the officers' understanding of the law governing the use of the passing lane was reasonable, and their observations gave them reasonable suspicion to instigate the traffic stop. *See Heien*, 574 U.S. at 66 (recognizing that "an officer may suddenly confront a situation in the field as to

which the application of a statute is unclear—however clear it may later become") (internal quotation marks omitted).

Waldeck also insinuated that the stop was tainted because the officers intended to pull Waldeck over before he even began driving down Highway 93. "Even if the police officer making the stop has an illicit motivation for his action, 'subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996) (alteration omitted)). In light of their personal observations, the officers had reasonable suspicion to believe that the traffic violation identified above had taken place, "and the ensuing stop was constitutional regardless of [the officers'] subjective intentions." *Id.*; *see also Willis*, 431 F.3d at 715 (holding that officer's observation of a traffic violation provided "specific and articulable facts" to justify stop).

Ultimately, the officers had reasonable suspicion that a traffic violation had occurred, making the stop lawful. And "[b]ecause the stop was based on reasonable suspicion of a traffic violation, [the Court] need not determine whether it was supported by reasonable suspicion of drug trafficking." *Miranda-Guerena*, 445 F.3d at 1238. Nonetheless, the information provided by Rodriguez provided an additional, independent ground upon which to stop Waldeck. That analysis is therefore provided below.

15

## II.   Drug Activity

"[A]n officer may only conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Brown*, 925 F.3d 1150, 1153 (9th Cir. 2019) (internal quotation marks omitted). In the case of an investigatory stop premised on information obtained from an informant, courts "consider the totality of the circumstances surrounding the stop, including both the content of the information possessed by the police and its degree of reliability." *Id.* (internal quotation marks omitted). A court must therefore assess "the informant's 'veracity' or 'reliability' and his 'basis of knowledge.'" *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Because there is no checklist for what makes an informant reliable, courts consider a wide range of factors. *See id.* at 907–08. For example, courts generally consider whether the informant is identifiable, whether the informant has a track record for providing good information to law enforcement, whether the informant's basis of knowledge is apparent, and whether the tip includes "detailed predictive information about future events" that can be corroborated through observation. *Id.*

Here, Haynes and Fisher had a tip from a known drug user and distributor that implicated Waldeck. While law enforcement had not received tips from Rodriguez before this incident, several other indicia of reliability were present to

16

support her tip. First, her identity was known and law enforcement was able to speak to her in person. "[A] known informant's tip is thought to be more reliable than an anonymous informant's tip." *Rowland*, 464 F.3d at 907; *see also United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004) (noting that a face-to-face encounter with an informant bolsters reliability because it allows officers to evaluate the informant's credibility).

Second, the officers were able to assess Rodriguez's basis of knowledge. The officers personally inspected Rodriguez's phone, seeing that she had exchanged text messages with an individual named "David" and was planning to purchase drugs from him. *See Rowland*, 469 F.3d at 908 ("[T]he informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information."). While Waldeck is correct that the officers never asked Rodriguez how she met Waldeck or how long they knew each other, she specifically stated that he had provided her with drugs in the past and that they planned to meet in Polson so she could purchase drugs from him. Rodriguez also stated that she was the one that encouraged Waldeck to come to the Reservation, specifically because of the high street prices for fentanyl.

Third, Rodriguez provided a plethora of predictive information. *See id.* Rodriguez stated that a man named "David" would be coming to Polson from out of state and that he would be getting a motel room in Polson, drove a newer red

17

Ford Mustang or Dodge Charger, was older, and had a large quantity of drugs on him. (*See* Doc. 52-2.) The officers then observed an older man with a newer red Dodge Charger enter and exit the Kwataqnuk and when they ran his plates, the vehicle came back registered to a David Waldeck. They then observed that same individual go to the Port Polson Inn and speak to Rodriguez. (*See* Doc. 52-1.) Thus, officers were able to confirm not only the innocent identifiers provided by the informant, but also connect Waldeck to drug activity in the area. *See Brown*, 925 F.3d at 1153–54 ("[A] tip must be reliable in its assertion of illegality not just its tendency to identify a determinate person.") (internal quotation marks and alteration omitted).

To be sure, not all of the information Rodriguez provided was reliable. Waldeck highlights one lie and three "inconsistencies" in her statements. First, Rodriguez lied to the officers when she texted them to say that Waldeck would not be returning to Polson until the next day even though the officers were, in that moment, looking at Waldeck's Charger in the Kwataqnuk parking lot. Second, and relatedly, Rodriguez told the officers that she specifically directed Waldeck *not* to stay at the Kwataqnuk. Third, Waldeck was from Washington, not Oregon. Finally, Waldeck argues that even though Rodriguez said she was going to buy drugs off him, the officers did not see such an exchange during their brief

interaction. But these considerations—many of which can be explained[4]—are simply part of the reliability assessment and do not fatally undermine the accurate, independently verifiable information that Rodriguez provided.

Ultimately, the totality of the circumstances surrounding Rodriguez's tip and the officers' subsequent observations provided specific and articulable facts upon which reasonable inferences could be drawn that warranted an investigatory stop of Waldeck based on suspected drug activity. *See Gates*, 462 U.S. at 238. Thus, this is an additional and independent basis for the traffic stop.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the motion to suppress (Doc. 51) is DENIED.

DATED this 27th day of March, 2023.

Donald W. Molloy, District Judge
United States District Court

---

[4] For example, Rodriguez had said that Waldeck had been in Oregon, (*see* Haynes Test.), and while Waldeck was parked in the Kwataqnuk parking lot, there is no indication he was actually staying there. Moreover, the officers made clear in their testimony that they could neither confirm *nor deny* that a drug exchange occurred. (*See* Haynes & Fisher Test.)

19